OPINION
{¶ 1} This appeal arises from the convictions of both Carole Dubose ("Dubose") and Ethel Smith ("Smith") in Youngstown Municipal Court on charges of impersonating peace officers while providing security at Youngstown, Ohio bars. Dubose and Smith are collectively referred to herein as Appellants.
 {¶ 2} Appellants' cases proceeded to joint bench trial on October 19, 2002, and they were convicted on that same date. Dubose appeals from her convictions on two counts arising out of impersonating a peace officer, violations of both R.C. §2921.51(B) and (D). Smith appeals from her single conviction in violation of R.C. § 2921.51(B) for impersonating a peace officer.
 {¶ 3} The court sentenced Appellants on November 18, 2002. These journal entries make it clear that Appellants were convicted of impersonating peace officers and not private police officers. Appellants timely appealed from these entries.
 {¶ 4} The state has failed to file briefs in these cases. Thus, the Court may accept Appellants' statements of the facts and issues as correct and reverse the judgments if Appellants' briefs reasonably appear to sustain such action. App.R. 18(C).
 {¶ 5} Dubose identifies one assignment of error on appeal, but it is asserted in two separate ways. Dubose's assignment of error, as set forth in her table of contents, states:
 {¶ 6} "The trial court denied [dubose] due process under the fourteenth amendment due to the fact she was found guilty of two (2) counts of impersonating a peace officer or private police officer, pursuant to orc § 2921.51, when said conviction was not based upon sufficient evidence displaying [dubose's] guilt beyond a reasonable doubt and the trial court was inconsistant [SIC] with the evidence and testimony presented at trial."
{¶ 7} Dubose's assignment of error is then presented on page three of her brief as:
{¶ 8} "The trial court denied [dubose] due process under the fourteenth amendment due to the fact her convictions were against the manifest weight of the evidence and the trial court's verdict was inconsistent with the evidence and testimony presented at trial."
 {¶ 9} The obvious difference between the two versions is the asserted legal standard, i.e., sufficiency of the evidence and manifest weight of the evidence. The Ohio Supreme Court in Statev. Thompkins (1997), 78 Ohio St.3d 380, 678 N.E.2d 541 has addressed the difference between the two theories and held that: "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." Id. at 386.
 {¶ 10} Whether the evidence presented in a criminal matter is legally sufficient to sustain a verdict invokes due process concerns and is a question of law. Id. The applicable inquiry for a sufficiency of evidence review is, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id. at 386; State v. Smith
(1997), 80 Ohio St.3d 89, 113, 684 N.E.2d 668.
 {¶ 11} Notwithstanding the inconsistent assignment of error, the body of Dubose's argument addresses the manifest weight of the evidence standard. "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence." Thompkins,78 Ohio St.3d at 387, 678 N.E.2d 541 citing State v. Robinson, (1955),162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148.
 {¶ 12} To determine whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way creating a manifest miscarriage of justice. Thompkins, 78 Ohio St.3d at 387, 678 N.E.2d 541. If an appellate court finds that a verdict is against the manifest weight of the evidence, then the court must reverse the conviction and order a new trial. This, however, should only be done in exceptional cases in which the evidence weighs heavily against the conviction. Id. citing State v. Martin (1983),20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.
 {¶ 13} In further distinguishing weight of the evidence from sufficiency of the evidence, Thompkins explained:
 {¶ 14} "[the w]eight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find thegreater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' (Emphasis added.)" Id. citing Black's Law Dictionary (6 Ed. 1990) 1594.
 {¶ 15} Smith asserts two assignments of error on appeal. Her first assigned error claims:
 {¶ 16} "[Smith] was denied due process of law when she was convicted of impersonating a police officer when the statute did not apply to the [smith] in the circumstances presented in this case."
 {¶ 17} Smith's second asserted error provides:
 {¶ 18} "[Smith] was employed at a bar as a security guard to attempt to prevent fights, drug sales, and other unlawful or undesireable conduct and was a `private policeman' whose status was for a `lawful purpose' and, thus, she was not guilty of impersonating a `private policeman' as proscribed by statute. (R.C. 2921.51 (B, F))."
 {¶ 19} Notwithstanding the differences in the language of the assigned errors, Smith's assignments are essentially the same as Dubose's. As such, Appellants' errors on appeal, for the most part, are addressed collectively herein.
 {¶ 20} The facts can be gleaned from the record of the trial testimony. The offenses arose at the Classique Lounge ("Classique") on May 24, 2002, and at Patsy's Lounge ("Patsy's") on July 13, 2002. Both establishments are located in Youngstown, Ohio.
 {¶ 21} On May 24, 2002, Captain Martin Kane ("Kane") of the Youngstown City Police Department ("YPD") observed two individuals, a black female and a white male, standing near the Classique. (Trial Tr. p. 51.) Kane was near this location in part because of ongoing department reports concerning constable problems. (Trial Tr. p. 50.) Kane observed that both individuals had visible guns in hip holsters, so he called for assistance. (Trial Tr. pp. 52-53.) Kane initially mistook the individuals as deputy sheriffs since they were dressed in what appeared to be police uniforms. (Trial Tr. p. 51.)
 {¶ 22} Prior to YPD Sergeant William Ross' ("Ross") arrival at the Classique in response to Kane's request for assistance, Dubose got into a vehicle in the Classique parking lot. (Trial Tr. pp. 35, 61.) Following the officers' request, Dubose got out of the vehicle and indicated that she was working at the Classique as security and that she was employed by the Ohio State Police Constable Service ("OSPCS"). (Trial Tr. p. 37.)
 {¶ 23} Thereafter, Dubose and Ross argued about the legality of her duties for the OSPCS. (Trial Tr. p. 39.) Ross testified that he advised Dubose the OSPCS was illegally commissioned and that no persons employed by the entity were authorized to work in the City of Youngstown. Ross made these assertions due to his prior experience as the lead investigating officer in several other incidents involving the OSPCS. (Trial Tr. pp. 37-40.)
 {¶ 24} Ross testified that Dubose was wearing a police uniform. (Trial Tr. p. 36.) Dubose was wearing dark clothing with an OSPCS patch; she had a badge and identification card; and she had a visible and loaded Smith and Wesson nine-millimeter handgun. (Trial Tr. pp. 41-42, 56, 59.) Ross testified that Dubose's uniform was similar to YPD uniforms but that her patch looked more like a deputy sheriff's patch. (Trial Tr. p. 43.)
 {¶ 25} After securing evidence, including Dubose's weapon, the officers returned to the police station to complete their report. (Trial Tr. pp. 58-59.) Thereafter, Ross determined that information provided by the Ohio Police Officer Training Academy ("OPOTA") did not reflect that Dubose was a police officer or had a legal commission evidencing her jurisdiction in Youngstown. (Trial Tr. pp. 40-41.)
 {¶ 26} Dubose's R.C. § 2921.51(D) conviction stems from this May 24, 2002, incident. Smith was not involved in the incident at the Classique.
 {¶ 27} Subsequently, on July 13, 2002, YPD officers encountered Dubose and Smith, along with one other individual, standing outside of Patsy's at approximately 11:30 p.m. All three individuals were wearing dark clothing, looked like police officers and had badges hanging from their necks. (Trial Tr. pp. 6-9.)
 {¶ 28} The state's first witness at trial, YPD Officer Douglas Pesa ("Pesa"), knew from prior experience that Appellants' badges were not local police enforcement agency badges. (Trial Tr. p. 23.) Pesa also knew that Appellants were not commissioned police officers. (Trial Tr. p. 26.) However, Pesa testified that Smith advised him that she was a police officer just like he was. (Trial Tr. p. 14.)
 {¶ 29} Appellants were wearing hats that had "police constable" printed on them. (Trial Tr. pp. 8, 16.) Smith was wearing black military tactical pants and a black leather jacket. (Trial Tr. p. 8.) She was also wearing a hip holster, but it did not contain a gun. (Trial Tr. p. 8.)
 {¶ 30} Following the officers' requests, Appellants presented their OSPCS identification cards. (Trial Tr. p. 16.) Upon questioning, Smith advised the officers that they were working security for Patsy's and that they were, "police officers just the same as we are." (Trial Tr. pp. 10, 14.) Dubose also advised Pesa that she was working security for Patsy's, but Dubose for the most part acquiesced to Smith's comments to the officers. (Trial Tr. p. 16.)
 {¶ 31} According to Pesa, the badge hanging from Smith's neck stated: "Ohio State Police Constable Sergeant Badge 82." (Trial Tr. p. 11.) Dubose's badge stated: "Ohio State Police Constable Badge No. 111." (Trial Tr. p. 15.) The badges were the same style badges issued by the YPD and those worn by the Mahoning County Task Force. (Trial Tr. p. 11.)
 {¶ 32} YPD Detective Sergeant Brad Blackburn ("Blackburn") investigated whether Dubose and Smith were trained or employed as Ohio police officers through the OPOTA, and he determined that they were not. (Trial Tr. pp. 64-66.) Further, Blackburn testified on cross-examination that security officer licenses must also be filed through OPOTA. (Trial Tr. pp. 67-68.)
 {¶ 33} While Dubose's sole assignment of error is that the state's evidence was insufficient to support her convictions or that the convictions were against the manifest weight of the evidence, her brief potentially consists of four sub-parts for analysis and in support of her claim that the state's evidence was deficient.
 {¶ 34} Dubose's first potential sub-topic asserts that no one, including the investigating and testifying officers, was misled or deceived by Dubose as she believes is required under R.C. § 2921.51. Smith also makes this assertion in her first assigned error.
 {¶ 35} Dubose was convicted under R.C. § 2921.51(B) and (D) whereas Smith was convicted solely pursuant to R.C. § 2921.51(B). In addressing this issue, it is first necessary to review R.C. §2921.51 in its entirety. R.C. § 2921.51(B) provides: "No person shall impersonate a peace officer or a private police officer." Appellants' R.C. § 2921.51(B) convictions are based on their impersonation of peace officers.
 {¶ 36} R.C. § 2921.51(A)(3) defines "impersonate":
 {¶ 37} "`Impersonate' means to act the part of, assume the identity of, wear the uniform or any part of the uniform of, or display the identification of a particular person or of a member of a class of persons with purpose to make another person believe that the actor is that particular person or is a member of that class of persons."
 {¶ 38} Further, R.C. § 2921.51(A)(1) defines peace officer and private police officer:
 {¶ 39} "`Peace officer' means a sheriff, deputy sheriff, marshal, deputy marshal, member of the organized police department of a municipal corporation, or township constable, who is employed by a political subdivision of this state, a member of a police force employed by a metropolitan housing authority * * *, a member of a police force employed by a regional transit authority * * *, a state university law enforcement officer * * *, a veterans' home police officer * * *, a special police officer employed by a port authority * * *, or a state highway patrol trooper and whose primary duties are to preserve the peace, to protect life and property, and to enforce the laws, ordinances, or rules of the state or any of its political subdivisions.
 {¶ 40} "(2) `Private police officer' means any security guard, special police officer, private detective, or other person who is privately employed in a police capacity."
 {¶ 41} Appellants argue that in order for an individual to be in violation of the statute, someone must actually be deceived by the impersonation. However, a plain reading of R.C. § 2921.51(B) and the pertinent definitions do not support this assertion.
 {¶ 42} This Court has previously addressed the issue and concluded that:
 {¶ 43} "[t]he statute only requires that the offender act with the purpose to make someone believe he or she is a peace officer. An offender can act with a purpose to make someone believe he or she is an offender without being successful in inducing such belief." State v. Forgac, 7th Dist. No. 02-CA-57, 2003-Ohio-4462, ¶ 35.
 {¶ 44} Dubose was also convicted under R.C. § 2921.51(D), which provides:
 {¶ 45} "No person, with purpose to commit or facilitate the commission of an offense, shall impersonate a peace officer, a private police officer, or an officer, agent, or employee of the state."
 {¶ 46} Subsection D likewise has no requirement that another person must actually be deceived by the offender's impersonation.
 {¶ 47} Notwithstanding, Kane initially mistook Dubose as a deputy sheriff at the Classique since she was wearing what looked like a police uniform. (Trial Tr. p. 51.)
 {¶ 48} Dubose's second sub-part to her sole assignment of error asserts that the state did not prove that she had the requisite culpable mental state. She argues she had no intent to deceive or commit a fraud, and thus, she cannot be convicted under this statute. However, as set forth above, the state had the burden to prove beyond a reasonable doubt, pursuant to R.C. §2921.51(B) and (D), only that Appellants had the purpose to make someone believe that they were peace officers. Both Appellants advised the officers that they were police constables. (Trial Tr. pp. 14, 15.)
 {¶ 49} R.C. § 2901.22(A) defines "purposely":
 {¶ 50} "(A) A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."
 {¶ 51} As identified above, the gist of the R.C. § 2921.51(B) and (D) impersonation offenses is to prohibit individuals from acting in a manner consistent with those of a peace officer, which includes wearing the uniform, assuming the identity or displaying the identification of a peace officer.
 {¶ 52} Appellants claim in their briefs that they were not acting deceptively, but that they were instead providing a lawful security service. Smith testified at trial that they were providing a lawful security service. (Trial Tr. pp. 70-73.) Smith also advised Pesa that she was a police officer just like he was. (Trial Tr. p. 14.)
 {¶ 53} Appellants assert that since they believed they were providing a lawful service and did not intend to impersonate anyone, that they lacked the requisite intent.
 {¶ 54} In furtherance of this argument, Smith asserts in her first assignment of error that the state failed to establish that she was not engaged in pursuing her lawful employment by the OSPCS on July 13, 2002. Smith testified at trial that she purchases her OSPCS uniforms at the Army Navy military store, that on the night she was charged she was monitoring Patsy's, checking identifications and generally making sure there were no problems. She acknowledges she was wearing a badge hanging from her neck. (Trial Tr. p. 76.) But for the wording on Smith's badge, it was identical to those issued by the YPD. (Trial Tr. p. 22.) She also admits that she had on black pants referred to as BDUs, which are the same pants that the Mahoning County Task Force wears. (Trial Tr. pp. 21, 77.)
 {¶ 55} Instead of helping her cause, Smith's admissions and the evidence on record reflect, in themselves, a plain violation of statute. R.C. § 2921.51(B) and (D) prohibit one's acting the part of, assuming the identity of, wearing the uniform or any part of the uniform of or displaying the identification of a peace officer. Appellants were dressed in dark clothing and hats labeled "Police Constable" and wearing visible and official-looking badges. (Trial Tr. pp. 16, 55-56.) Kane testified that the badge he confiscated from Dubose was identical to YPD badges. (Trial Tr. p. 56.) It was a silver badge depicting the official seal of the State of Ohio with a leather neck holder. (Trial Tr. pp. 55-56.) Smith told the officers she was an officer just like they were. Dubose told Ross that she was an authorized police constable since her employer was incorporated in the State of Ohio.
 {¶ 56} Regardless of Appellants' mistaken beliefs that they were lawfully working security, this does not overcome the fact that they were purposefully identified as and wearing the uniforms of peace officers. R.C. § 2921.51(A)(1) and (B) do not distinguish between one's purporting to be a police officer, task force agent, deputy sheriff or a combination thereof. It simply prohibits the act of impersonation. It makes no difference that Appellants' hats and badges indicated that they were "constables" because they also included the words "Ohio State" and "police." R.C. § 2921.51(A)(1).
 {¶ 57} Based on the foregoing, Appellants' erroneous assumptions as to the legality of their conduct is not a defense. It is long settled in Ohio that all persons are presumed to know its laws, and a mistake in law is not a defense to a criminal charge. State v. Pinkney (1988), 36 Ohio St.3d 190, 198,522 N.E.2d 555.
 {¶ 58} Dubose's next sub-issue and Smith's second assigned error are substantially similar and rely on some of the arguments above. Appellants allege that they are entitled to the affirmative defense set forth in R.C. § 2921.51(F), "* * * that the impersonation of the peace officer was for a lawful purpose." Appellants assert that they were acting with the lawful purpose to protect the two bars and patrons.
 {¶ 59} Appellants have the burden to prove by a preponderance of the evidence that they are entitled to an affirmative defense. R.C. § 2901.05. Thus, Appellants must have presented sufficient evidence to establish that they were lawfully trained and employed in their private security officer capacity.
 {¶ 60} Acting as a security officer to protect drinking establishments and their patrons is a lawful endeavor if the individual is actually a licensed private security officer. R.C. § 4749.03 requires all private security guards and private investigators to be licensed. State v. Rutland,152 Ohio App.3d 59, 786 N.E.2d 530, 2003-Ohio-1425, ¶ 23.
 {¶ 61} Appellants assert that they were acting lawfully since they were working for a bar in a security capacity and that they were authorized Ohio State Police Constables. However, neither Dubose nor Smith alleges that they were actually licensed private security officers. Smith simply asserts that the state failed to prove that she was not licensed.
 {¶ 62} Smith also directs this Court's attention to Pesa's trial testimony during which he conceded that preventing bar fights, underage drinking and drug trafficking are "good things." (Trial Tr. p. 24.)
 {¶ 63} This Court has addressed a similar claim in State v.Rutland, 152 Ohio App.3d 59, 786 N.E.2d 530, 2003-Ohio-1425. Rutland, also charged under R.C. § 2921.51, claimed to be lawfully acting as a privately employed constable. Id. at ¶ 19. This Court noted that the Ohio Revised Code allows two types of constables. Id. at ¶ 25. The first recognized type of constable is a "township constable," which is by definition a type of "peace officer" pursuant to R.C. § 109.71(A). Id. A township constable is commissioned and employed by either an Ohio subdivision or by a metropolitan housing authority. R.C. §109.71(A)(1); Id. The second recognized type of constable is a court-appointed "special constable." R.C. § 1711.35; Id. Special constables must have valid Ohio peace officer training commission certificates. R.C. § 1901.141(A).
 {¶ 64} As set forth above, Blackburn testified that Appellants were not trained or employed as Ohio police officers through the OPOTA. (Trial Tr. pp. 65, 66.) He testified that the OPOTA training was a prerequisite to any state employment as a peace officer. (Trial Tr. pp. 64-65.) Finally, Ross testified that the Ohio State Police Constables, Appellants' employer, was not itself legally commissioned in the City of Youngstown. (Trial Tr. pp. 37-40.)
 {¶ 65} Dubose presented no evidence at trial. Smith did testify at trial, however, her testimony that she was employed by the OSPCS does not establish that she was lawfully trained and employed in her constable capacity. Further, the OSPCS's status as a corporation registered with the State of Ohio does not in any manner eliminate its compliance with applicable state laws, specifically those governing private security licensing and impersonating State of Ohio peace officers. Rutland at ¶ 22. "The employees still must have the necessary license and comply with the applicable statutes." Id.
 {¶ 66} The record reflects that Appellants failed to present any evidence establishing that they were lawfully trained and employed in their constable capacities. Therefore, this potential sub-issue and Smith's second assignment of error are overruled.
 {¶ 67} Based on the above, Appellants' convictions in violation of R.C. § 2921.51(B) are affirmed.
 {¶ 68} Dubose's final sub-issue concerns her second offense, her conviction pursuant to R.C. § 2921.51(D) for committing a criminal offense while impersonating an officer. Under this sub-issue, Dubose claims first that she was improperly convicted since she was never charged with the underlying offense. Secondly, she asserts that the state failed to establish the requisite elements of the underlying offense, i.e., the state did not establish that the gun was operable.
 {¶ 69} This violation concerns Dubose's conduct on May 24, 2002, at the Classique. As earlier addressed, Dubose was dressed like a police officer on that date, was wearing a badge and had a gun in her hip holster. (Trial Tr. pp. 41-42, 56.) Both Kane and Ross testified that Dubose possessed a gun that night. (Trial Tr. pp. 41, 56.)
 {¶ 70} Again, R.C. § 2921.51(D) provides:
 {¶ 71} "No person, with purpose to commit or facilitate the commission of an offense, shall impersonate a peace officer, a private police officer, or an officer, agent, or employee of the state."
 {¶ 72} Contrary to Dubose's assertions, a plain reading of R.C. § 2921.51(D) does not require the offender to be charged with or convicted of the underlying offense. Thus, this particular portion of the claims in her sub-issue lacks merit.
 {¶ 73} Dubose's next contention is that the state failed to establish the requisite elements of the underlying offense. In order to assess the elements of the underlying offense, this Court must first ascertain which offense Dubose was allegedly violating while impersonating an officer.
 {¶ 74} It is not clear from the trial court record what underlying offense Appellant Dubose had committed. Dubose asserts that the alleged underlying offense was for carrying a concealed weapon. Since Dubose's brief is unopposed, we are permitted to accept her statement that the underlying offense was for carrying a concealed weapon. App.R. 18(C).
 {¶ 75} R.C. § 2923.12, carrying concealed weapons provides: "(A) No person shall knowingly carry or have, concealed on his or her person or concealed ready at hand, any deadly weapon or dangerous ordnance." This statute appears to be inapplicable to the instant case because there was no evidence that Dubose was concealing her gun: it was apparently in plain view. (Trial Tr. pp. 52-53.)
 {¶ 76} Dubose asserts that the state failed to prove that the handgun was operable. Dubose fails to direct this Court's attention to any caselaw in support of this requirement, but the Ohio Supreme Court has addressed this issue before and noted:
 {¶ 77} "`Firearm' is defined in R.C. 2923.11(B) as `any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. `Firearm' includes an unloaded firearm, and any firearm which is inoperable but which can readily be rendered operable.' The state must prove beyond a reasonable doubt that the firearm was operable or could readily have been rendered operable at the time of the offense. * * *
 {¶ 78} "Operability may be inferred from the totality of the circumstances and may be established by the testimony of lay witnesses. * * * Further, proving operability does not require the state to provide an empirical analysis or examination of the gun * * *." (Citations omitted.) State v. Mann (1993),93 Ohio App.3d 301, 311, 638 N.E.2d 585.
 {¶ 79} In Thompkins, 78 Ohio St.3d 380, 678 N.E.2d 541, the Ohio Supreme Court, in determining whether an individual was in possession of an operable firearm or a firearm capable of being readily rendered operable at the time of the offense, held that the trier of fact may consider all relevant facts and circumstances surrounding the crime, including any implicit threats made by the individual in possession of the firearm. Id. at paragraph one of the syllabus.
 {¶ 80} In the instant cause, there was no direct evidence establishing that Dubose's gun was operable. Further, the only potential circumstantial evidence in support of the operability of the gun is that Dubose was wearing the gun in a hip holster while purportedly providing security at a dangerous bar at night. (Trial Tr. pp. 50-53, 60.) Dubose did not make any explicit or implicit threats to use the gun. However, her appearance as an official, authorized officer may have implied that her visible gun was operable.
 {¶ 81} Notwithstanding, there was no evidence that Dubose was in any way concealing her gun. There is no other indication on the record of any other criminal activity on Dubose's part, aside from the fact of her impersonation. As such, there was insufficient evidence supporting that Dubose was impersonating a peace officer with the purpose to commit another offense in violation of R.C. § 2921.51(D).
 {¶ 82} Therefore, Appellant Dubose's sole assignment of error is hereby overruled relative to her first three sub-issues. Her conviction in violation of R.C. § 2921.51(B) is affirmed. However, Dubose's conviction pursuant to R.C. § 2921.51(D) was in error and is hereby reversed and vacated.
 {¶ 83} Appellant Smith's assignments of error are overruled and her conviction of a violation of R.C. § 2921.51(B) is hereby affirmed in its entirety.
Donofrio, J., DeGenaro, J., concurs.